**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

**JOHN ERIC SWAIM,**

Plaintiff,

**v.**

**CITY OF HURST, TEXAS; OFFICER DUSTIN SMITH,
individually and in his official capacity; OFFICER ROBIN
BALDERS, individually and in her official capacity; OFFICER
DISRAELI ARNOLD, individually and in his official capacity;
OFFICER CODY JAYNES, individually and in his official capacity;
TARRANT COUNTY, TEXAS; and SGT. M. EMPKEY, OFFICER M. EXTER, CPL.
M. DELAGARZA, CPL. J. CORTEZ, and OFFICER C. VIGIL
(Tarrant County Jail Officers), individually and in their official capacities,**

Defendants.

Civil Action No. _____

**4-26 C V - 4 0 4 - Y**

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. § 1983**

**AND RELATED CLAIMS — DEMAND FOR JURY TRIAL**

**INTRODUCTION**

Plaintiff Eric Swaim, proceeding pro se, brings this action pursuant to 42 U.S.C. § 1983 for

violations of his rights under the First, Fourth, and Fourteenth Amendments to the United

States Constitution, and related claims, arising out of a brutal and unprovoked assault

committed against him by Hurst Police Officer Dustin Smith on August 7, 2019, and a subsequent assault by Tarrant County Jail officers two days later. Plaintiff seeks compensatory damages, punitive damages, declaratory relief, and all other relief to which he is entitled.

## I. JURISDICTION AND VENUE

1. This Court has original jurisdiction over Plaintiff's federal civil rights claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), and 42 U.S.C. § 1983.

2. Venue is proper in the Fort Worth Division of the Northern District of Texas pursuant to 28 U.S.C. § 1391(b)(2), because the events giving rise to this action occurred in Hurst, Tarrant County, Texas, and in the Tarrant County Jail, all of which are located within this division.

3. Joinder of all Defendants in this single action is proper pursuant to Federal Rule of Civil Procedure 20(a)(2). The claims against the City of Hurst, the individual Hurst Police Officers, Tarrant County, and the Tarrant County Jail officers all arise out of the same series of transactions and occurrences: the August 7, 2019 assault at 971 W. Glade Road; Plaintiff's subsequent detention in the Tarrant County Jail directly resulting from that arrest; the August 9, 2019 assault at the Tarrant County Jail; and the coordinated cover-up and retaliation that followed. Common questions of law and fact — including the nature and extent of Plaintiff's injuries, the suppression of evidence, the retaliatory prosecution, and the damages sustained — run through all claims against all Defendants. The City of Hurst's actions placed Plaintiff in the custody of Tarrant County, and Tarrant County's command personnel reviewed the

Hurst video footage while Plaintiff was in their custody without taking action to secure his release or protect him — making the two defendants' conduct legally and factually intertwined. Joinder serves the interests of judicial economy and avoids inconsistent adjudications.

## II. PARTIES

3. Plaintiff John Eric Swaim (hereinafter 'Mr. Swaim' or 'Plaintiff') is a citizen of the United States and a resident of Texas. At all relevant times, Mr. Swaim was a licensed Texas real estate broker and the owner of a business and residence located at 971 W. Glade Road, Hurst, Texas 76054. He holds a Bachelor of Business Administration in Finance from the University of Texas at Arlington.

4. Defendant City of Hurst, Texas is a municipal corporation organized under the laws of the State of Texas. The City of Hurst employs and is responsible for the supervision, training, and conduct of the Hurst Police Department and its officers.

5. Defendant Officer Dustin Smith (Badge HU629) was, at all relevant times, a duly appointed and acting patrol officer employed by the Hurst Police Department, acting under color of state law. He is the reporting and investigating officer on Hurst Police Department Case No. 2019-003728. He is sued in both his individual and official capacities.

6. Defendant Officer Robin Michelle Balders was, at all relevant times, a duly appointed and acting police officer employed by the Hurst Police Department, acting under color of state law. She is sued in both her individual and official capacities. Notably, Officer

Balders is listed as the victim in Case No. 2019-003728 — despite the fact that she was not assaulted and the true victim was Mr. Swaim.

7. Defendant Officer Disraeli Arnold was, at all relevant times, a duly appointed and acting police officer employed by the Hurst Police Department, acting under color of state law. He is sued in both his individual and official capacities. Officer Arnold had previously been terminated from the Hurst Police Department in or around 2013 for misconduct — including threatening a minor by saying "move and die" and using vulgar, anti-gay language — and was subsequently rehired, evidencing a pattern and practice of tolerating officer misconduct.

8. Defendant Officer Cody Jaynes was, at all relevant times, a duly appointed and acting police officer employed by the Hurst Police Department, acting under color of state law. He is sued in both his individual and official capacities.

9. Defendant Tarrant County, Texas is a governmental entity organized under the laws of the State of Texas. Tarrant County operates and is responsible for the Tarrant County Jail and the supervision, training, and conduct of its detention officers.

10. Defendants Sergeant M. Empkey (Badge #72819), Officer M. Exter (Badge #74562), Corporal M. DeLaGarza (Badge #73638), Corporal J. Cortez (Badge #73743), and Officer C. Vigil (Badge #74623) are the Tarrant County Jail officers who participated in the assault upon Plaintiff on August 9, 2019. Their identities have been confirmed through the Tarrant County Sheriff's Department Use of Force Report (Service #2019-10877). They are sued in both their individual and official capacities. Additionally, RN Michelle Hill (Employee #212074) treated Plaintiff after the jail assault and authored a medical report that falsely attributes a statement to Plaintiff.

The report states Plaintiff said: "I am fine, y'all shouldn't have to pay for this. Just let me go home." Plaintiff states the opposite is true — he told jail personnel that the officers should get in trouble for what they did to him.

### III. TOLLING OF THE STATUTE OF LIMITATIONS

11. The applicable statute of limitations for claims under 42 U.S.C. § 1983 in Texas is two years. See Tex. Civ. Prac. & Rem. Code § 16.003. However, the limitations period is equitably tolled for the following independent and cumulative reasons:

12. Fraudulent Concealment and Active Suppression of Evidence. Defendants actively concealed and suppressed critical evidence of their constitutional violations. Officer Smith intentionally deactivated his body-worn camera during the most severe portion of the assault. After the camera was off, he dismissed Officer Balders from the room and proceeded to torture Plaintiff — acts known only through Plaintiff's testimony precisely because Smith ensured no recording existed. Officer Balders' body camera footage was withheld, and Defendants falsely claimed her camera malfunctioned, directly contradicting her own on-camera statement that she was recording. The initial audio from Officer Jaynes' body camera footage is absent, with his first audible words being 'somebody just got racked' — evidence the assault was broadcast over radio. The counter video from Hurst Police headquarters captured a clerk stating she could not yet edit the footage, evidencing that footage existed and was being withheld. The City of Hurst withheld a portion of the footage to the Texas Attorney General. When Plaintiff submitted open records requests, he was informed that additional footage did not exist or had been withheld — acts of deliberate concealment that prevented him

from discovering the full scope of his claims. Under the discovery rule and equitable tolling principles, the limitations period does not begin to run until a plaintiff knew or reasonably should have known of the injury and its cause.

13. Mental Incapacitation — Unsound Mind. Texas law tolls the statute of limitations when a person is of 'unsound mind' at the time a cause of action accrues. See Tex. Civ. Prac. & Rem. Code § 16.001(a). Once a plaintiff pleads unsound mind as a tolling defense, the burden shifts to the defendant to prove the plaintiff was of sound mind — not the other way around. See Ruiz v. Conoco, Inc., 868 S.W.2d 752 (Tex. 1993). Plaintiff was of unsound mind on August 7, 2019, and for a substantial period both before and after that date. The following evidence, developed through discovery, will establish this: (a) Prior to the assault, Plaintiff had been under the active care of Dr. Kane Berryhill, neurologist, for documented cognitive and neurological impairment; (b) On July 15, 2019 — just 23 days before the assault — Plaintiff was taken to the emergency room and documented as experiencing disorientation and an altered mental state with elevated blood pressure; (c) On July 1, 2019 — 37 days before the assault — Plaintiff's ex-wife Terri Swaim retained an attorney and had a formal Power of Attorney document prepared, seeking to transfer Plaintiff's legal decision-making authority to another person. This is direct contemporaneous third-party evidence, prepared by legal counsel, that those closest to Plaintiff believed he lacked full legal capacity before the assault. The POA document is retained by Plaintiff and dates from July 1, 2019 — the same date as the Bedford medical incident that later became the subject of retaliatory prosecution; (d) As a result of Plaintiff's condition, his associates and employees had developed a formal plan to

continue business operations during his incapacity — further evidence that his impairment was recognized by others as ongoing and serious; and (e) Officer Balders' own bodycam footage includes an interview with a witness named Jamie who confirms that Plaintiff was living at his office due to his condition, corroborating that his mental health impairment was observable and known to third parties before the assault. (f) In September 2023, Plaintiff's retained attorney in a separate civil proceeding (Floyd Swaim and Shelly Swaim v. Eric Swaim, Cause No. 342-338159-22, 342nd Judicial District, Tarrant County, Texas) filed a Motion to Withdraw as Counsel, stating that the withdrawal was "due to an inability of counsel and Defendant to effectively communicate." This court filing by a licensed attorney constitutes independent evidence that Plaintiff's cognitive impairment — first documented by Dr. Berryhill and the July 2019 Power of Attorney — persisted through at least September 2023, more than four years after the assault. At the motion to dismiss stage, the Court must accept these allegations as true. If Defendants seek dismissal on limitations grounds, the burden is theirs to prove Plaintiff was of sound mind — a burden they cannot meet on the face of the complaint.

14. Physical Incapacitation and Ongoing Medical Treatment. The August 7, 2019 assault caused multiple physical injuries, including head lacerations requiring stitches, dizziness, blunt force trauma to Plaintiff's testicles from both punches and taser use in "piledrive" mode, and hearing loss. Medical records dated September 15, 2019 document that Plaintiff had lost a significant percentage of hearing in his left ear following the incident. The physical and neurological effects of the assault impaired Plaintiff's ability to pursue legal action in the immediate aftermath.

15. Intimidation and Reasonable Fear for Physical Safety. During the assault, Officer Smith made statements which Plaintiff reasonably interpreted as threats to his life — implying Plaintiff would not survive to report Smith's actions. After being transferred to Tarrant County Jail, Plaintiff was beaten by five jail officers while in handcuffs and shackles. After his release, believing he was being hunted, Plaintiff swam across the Trinity River and walked along railroad tracks for over ten hours to avoid detection. These objective circumstances created a reasonable and ongoing fear that pursuing legal action would endanger Plaintiff's life. The doctrine of equitable estoppel tolls the limitations period where a plaintiff has been prevented from asserting claims by threats, duress, or intimidation by the defendant.

16. Ongoing Criminal Proceedings as Retaliatory Suppression. Following the Hurst incident, Defendants — and the Tarrant County District Attorney's office — initiated and continued criminal proceedings against Plaintiff that appeared designed to suppress his civil claims. All charges arising from the August 7, 2019 incident were dismissed ('no-billed'). Nevertheless, in October 2019, Bedford police issued a felony warrant for Plaintiff's arrest related to a separate July 1, 2019 medical emergency. Plaintiff was never contacted or notified prior to the warrant being issued. The Tarrant County DA hired a private investigator to locate Plaintiff's associate Jarod, apparently seeking information to use against Plaintiff. The felony charges were ultimately reduced to a misdemeanor and Plaintiff completed probation. The initiation of felony proceedings — later reduced only after Plaintiff's compliance — constituted an ongoing act of retaliation and intimidation that equitably tolled the limitations period. Officer Arnold

stated that Plaintiff was going to jail 'for something' on the night of the arrest, demonstrating the retaliatory intent that permeated subsequent proceedings.

17. Cover-Up by Supervisory and Command Personnel. Command personnel and supervisors of the Hurst Police Department, including the President of the Hurst Police Officers Association and the Chief of Police, reviewed the body camera footage while Plaintiff was still in jail. Despite observing clear evidence of excessive force, none took action to secure Plaintiff's release, investigate the incident, or advise Plaintiff of his rights. This institutional cover-up — extending from the scene to the command level — constitutes ongoing fraudulent concealment tolling the limitations period.

18. For all the foregoing reasons, the statute of limitations was equitably tolled, and this action is timely filed.

## IV. STATEMENT OF FACTS

### A. Background

19. Eric Swaim grew up in Colleyville, Texas, graduated from Grapevine High School, and earned a Bachelor of Business Administration in Finance from the University of Texas at Arlington. He later obtained teaching certification from UT Dallas and taught at Lamar Middle School, Greiner Arts Academy, and Molina High School in Dallas.

20. In 2001, Mr. Swaim and his family formed a real estate business, purchasing, selling, and managing properties primarily in Tarrant County. As of the date of this filing, the family's real estate holdings in Tarrant County are valued at over forty million dollars

($40,000,000). In approximately 2007, Mr. Swaim became a licensed Texas real estate broker.

21. Beginning in June 2019, Mr. Swaim began residing at his business property at 971 W. Glade Road, Hurst, Texas 76054. This property served as both his office and his residence at all relevant times on August 7, 2019. Officer Balders' body camera footage includes an interview with a woman named Jamie who confirms that Mr. Swaim was living at the office. The Fourth Amendment's full protection against warrantless entry therefore applies to this premises regardless of its commercial character.

22. Prior to the August 7, 2019 incident, Mr. Swaim had been experiencing documented medical issues affecting his mental health and cognitive function. He was under the active care of Dr. Kane Berryhill, neurologist, for documented cognitive and neurological impairment. On July 15, 2019 — just 23 days before the assault — he was taken to the emergency room, where he was documented as experiencing disorientation and an altered mental state with elevated blood pressure. The impairment was serious enough that on July 1, 2019 — 37 days before the assault — his ex-wife Terri Swaim retained an attorney and had a formal Power of Attorney document prepared, seeking to transfer Plaintiff's legal decision-making authority to another person. This attorney-drafted document dated July 1, 2019 is retained by Plaintiff and constitutes direct, contemporaneous, third-party evidence that those closest to him believed he lacked full legal capacity in the weeks before the assault. As a result of his condition, associates and employees had developed a plan to maintain business operations during his incapacity. Mr. Swaim was of unsound mind

on August 7, 2019. He had no history of arrest or conviction for any drug-related offense. Multiple laboratory reports from 2018 confirmed he was negative for all illegal substances, and Jarod Gibson confirmed to Officer Balders on camera that he had never seen Mr. Swaim use drugs. Mr. Swaim had completed probation for an alcohol-related DUI received on January 1, 2017 in Alabama — an offense entirely unrelated to drug use, and the only criminal history Defendants could attempt to raise.

## B. The Events of August 7, 2019 — The Initial Contact

23. On the morning of August 7, 2019, a young man named Jarod Gibson brought his belongings to 971 W. Glade Road. He had recently been evicted from his residence in Garland, Texas. He came to Mr. Swaim for assistance. Mr. Swaim allowed Jarod to do some work in exchange for assistance.

24. During the course of the morning, Jarod was repeatedly distracted by his phone. At one point, Mr. Swaim picked up the phone and walked toward the break room to put it away. Jarod came from behind and grabbed the phone back. Mr. Swaim allowed him to keep it but warned him that further distraction would require him to leave.

25. When Jarod continued to be unproductive, Mr. Swaim asked him to leave the premises. Jarod left stating he was going to call the police. Mr. Swaim did not know what complaint Jarod intended to make.

26. According to officer body camera footage reviewed by Plaintiff, Jarod called the Hurst Police not to allege assault, but because he wanted the police to "facilitate a conversation" between himself and Mr. Swaim. After speaking with Jarod, Officer Balders reported his statement on camera to Officer Arnold. She confirmed that Jarod

did not want to press charges and only wanted the parties to "work it out." Critically, Officer Balders explicitly stated on camera that when she asked Jarod whether Mr. Swaim had hit him, Jarod answered that Mr. Swaim had not hit him. There was no allegation of assault. There was no crime. There was no basis for Officer Smith's forced entry, no basis for any use of force, and no probable cause to arrest Mr. Swaim. Officer Balders held up a blank notepad as her only record of this interview — meaning no contemporaneous written record of Jarod's statement was ever made.

## C. Officer Smith's Unlawful Entry and Assault

27. Officer Robin Balders was the first officer to arrive and began speaking with Jarod outside the east side of the building. Officer Dustin Smith arrived shortly thereafter. Rather than speaking with either Officer Balders or Jarod to learn the nature of the complaint, Officer Smith walked directly to the front door of 971 W. Glade Road and knocked.

28. Mr. Swaim answered the door and immediately told Officer Smith: 'We're closed.' This statement was an explicit communication that the premises were not open for entry. Officer Smith asked whether Mr. Swaim was "involved in this deal out here" and asked to speak with him. Mr. Swaim, who did not know what complaint had been made and had not been told the reason for the police contact, asked Officer Smith to find out what Jarod's complaint was so that he could respond to it. Mr. Swaim noticed Officer Smith had a hostile expression. Mr. Swaim told the officer he needed to use the restroom and closed the door. At no point did Mr. Swaim consent to entry.

29. Officer Smith did not proceed to speak with Officer Balders or Jarod to determine the nature of the complaint. He waited at the door for several minutes. He then opened the front door of the building — which Mr. Swaim had closed — without permission and without a warrant.

30. When Mr. Swaim returned to the door area, he observed Officer Smith opening the door. Officer Smith later falsely stated on camera that Mr. Swaim had opened the door. Officer Smith inserted his foot in the threshold to prevent the door from closing and began moving into the building.

31. Mr. Swaim, alarmed by this unlawful entry into his office building, which also served as his residence, warned Officer Smith that he had mace. He did not point or brandish the mace. Officer Smith responded by advancing further and swinging his fist at Mr. Swaim, declaring that Mr. Swaim was not going to threaten him with mace. Officer Smith later admitted on camera that he "started throwing haymakers."

32. Mr. Swaim asked Officer Smith if he was being recorded by body camera. Officer Smith confirmed he was. Mr. Swaim stated he was going to call 911. Officer Smith grabbed Mr. Swaim's phone from his hand and threw it across the room, preventing him from calling for help or recording the incident.

**D. The Deliberate Torture — Camera Deactivated**

33. Officer Balders entered the office. Together, Officers Smith and Balders placed Mr. Swaim in handcuffs on the ground. At this point, with Mr. Swaim fully restrained and posing no threat, Officer Smith reached up toward his shoulder and deliberately deactivated his body-worn camera.

34. After the camera was deactivated, Officer Smith — as Mr. Swaim recalls — told Officer Balders she may want to step out of the office because he was going to do some "[inaudible word] justice" on Mr. Swaim. Because the camera was already off at this point, this statement is known only through Plaintiff's testimony. Officer Balders complied and left the room, leaving Mr. Swaim alone with Officer Smith.

35. With his camera off and the female officer removed from the room, Officer Smith proceeded to: (a) repeatedly slam Mr. Swaim's head against the hard floor; (b) punch Mr. Swaim in the testicles; and (c) apply the taser in "piledrive" mode, shocking Mr. Swaim's testicles. This torture continued for over one full minute.

36. Officer Cody Jaynes was en route to the scene in a police vehicle with another officer. The produced body camera footage from Officer Jaynes contains no audio for the initial portion of the recording. At the very beginning of the portion of the recording where audio is present, Officer Jaynes can be heard stating "somebody just got racked." This statement, made while Jaynes was still en route, is direct evidence that at least a portion of the assault on Mr. Swaim was broadcast over the police radio and that Officer Jaynes was aware of the attack before he arrived at the scene.

37. When Officer Arnold (Disraeli) arrived at the scene and exited his vehicle in front of 971 W. Glade Road, the audio on his body camera captures Mr. Swaim screaming for help from inside the building. The initial portion of Officer Arnold's body camera footage also lacks audio.

38. The absence of audio from the initial portions of both Officers Jaynes' and Arnold's body camera recordings — combined with Officer Jaynes' statement at the very moment audio begins — constitutes evidence that the assault was broadcast over police radio

and that multiple officers were aware of Officer Smith's criminal conduct in real time. The significance of this evidence is addressed in the academic research identified in Plaintiff's files: 'Missing Police Body Camera Videos: Remedies, Evidentiary Fairness, and Automatic Sanctions.'

## E. Continued Abuse and Suppression Following the Assault

39. Officer Arnold entered the building and found Mr. Swaim handcuffed on the floor. He immediately began questioning Mr. Swaim about the ownership of the office. When Mr. Swaim asked why office ownership was relevant to anything, Officer Arnold stated: "Because you're going to sue us." This statement reflects awareness that a legal wrong had been committed and a preoccupation with managing the civil liability consequences rather than investigating the assault or attending to Mr. Swaim's injuries.

40. With Mr. Swaim restrained on the ground, Officer Smith continued to step on Mr. Swaim's arm and hand. When Mr. Swaim reported this pain to Officer Arnold, Officer Arnold laughed.

41. Mr. Swaim reported the assault to the arriving officers multiple times, clearly stating that Officer Smith had entered his office without permission and had beaten him. He reported pain in his testicles, dizziness, and head injuries. When he requested medical care, Officer Smith stated that Mr. Swaim was "not going to the hospital." Officers told him multiple times to be quiet and that it was not the right time to talk, in an apparent effort to prevent him from making statements on camera.

42. During this period, Officer Smith made statements that Mr. Swaim reasonably interpreted as a threat to his life — implying that Mr. Swaim might not survive to report what had happened. When Mr. Swaim asked whether Smith was threatening him, Smith replied, in substance, "take it as you want." These statements caused Mr. Swaim to fear for his life.

43. Officer Arnold stated that Mr. Swaim was going to jail for "something." When asked about this statement, Officer Arnold denied having said it. Officer Arnold did not know any details of the incident at the time he made this statement.

44. Officer Balders did not inform the other officers that Smith had sent her out of the room before the assault. Body camera footage from another officer captures Officer Balders stating at approximately timestamp 00:53: 'No your not, not your not — Everything is [recorded]' — confirming that her camera was recording. Seconds later, at timestamp 00:59, Mr. Swaim asks directly: 'Are you on camera?' This exchange, captured on a separate officer's body camera, directly contradicts the City's subsequent claim that Officer Balders' camera had malfunctioned and produced no footage. Her camera was recording. The footage was withheld.

45. Officers Arnold and Balders began to leave the office, leaving Mr. Swaim alone with Officer Smith. Mr. Swaim began screaming, believing that Officer Smith intended to kill him. Officer Arnold then placed Mr. Swaim in his police vehicle. In doing so, the officers lifted Mr. Swaim completely off his feet and struck his head against the side of the vehicle, causing additional bleeding and a head wound. Mr. Swaim believed this was deliberate.

## F. Medical Care Denied — Hospital

46.Mr. Swaim repeatedly requested ambulance transport. For a substantial period, his requests were denied. He was ultimately transported by ambulance to the hospital.

47.At the hospital, Officer Arnold (Disraeli) continued to mistreat Mr. Swaim. He refused to reposition Mr. Swaim's handcuffs to the front, despite requests from medical personnel. He initially agreed to remove the handcuffs, then claimed Mr. Swaim was not cooperating and left them in place. He denied Mr. Swaim's repeated requests for water. Officer Arnold was more concerned with questioning Mr. Swaim about the ownership of his office than with ensuring he received medical care.

48.Mr. Swaim requested an MRI. The treating physician initially ordered a CAT scan. After the scan was completed, the physician left without reviewing the results with Mr. Swaim. Mr. Swaim was told no further care was available that night.

49.The hospital's emergency personnel noted that Mr. Swaim had been tased and stated that he needed to be placed on a cardiac monitor as a result. The Hurst officers apparently failed to inform the hospital of the full nature and extent of the taser application.

50.The officers took Mr. Swaim's hospital discharge papers and transported him to jail. At the jail, a jailer read portions of the discharge papers aloud in a manner that was unintelligible and alarming to Mr. Swaim, who was unable to assess the extent of his untreated injuries. From this point until he was able to obtain his medical records independently, Mr. Swaim was in fear that he had sustained life-threatening injuries.

### G. The Tarrant County Jail Assault

51.Mr. Swaim was transported to Tarrant County Jail. During his incarceration, multiple officers up the chain of command within the Hurst Police Department, including the

President of the Hurst Police Officers Association and the Chief of Police, reviewed the body camera footage of the August 7, 2019 incident. None took any action to secure Mr. Swaim's release, investigate the misconduct, or follow up on his reports of assault. Mr. Swaim's statement regarding Officer Smith's attack on his genitals was never investigated.

52. Two days after his arrest, on August 9, 2019, Mr. Swaim was being processed for release from Tarrant County Jail. He was still in handcuffs and leg shackles when he was presented with a form stating he had received all of his personal property. Because he had not, in fact, received his property, Mr. Swaim refused to sign the false statement.

53. In response to Mr. Swaim's refusal to sign, a Code 6 Signal 5 (Officer/Inmate Fight) was called over the radio. Five Tarrant County Jail officers — Sergeant M. Empkey, Officer M. Exter, Corporal M. DeLaGarza, Corporal J. Cortez, and Officer C. Vigil — responded and attacked Mr. Swaim. Despite the fact that he was fully restrained in handcuffs and shackles, these officers placed him on the ground, applied additional hand and leg restraints, and beat him across his body. His previously stitched right eyebrow laceration was reopened during the assault. He was taken to Level 5 Medical Resource at the jail for emergency treatment by RN Michelle Hill (Employee #212074). RN Hill's medical report falsely attributes a statement to Mr. Swaim, recording that he said: "I am fine, y'all shouldn't have to pay for this. Just let me go home." Mr. Swaim states the opposite — he told jail personnel that the officers should get in trouble for what they did to him. This false attribution in an official medical record is consistent with the pattern of evidence fabrication that pervades this case.

54. After receiving emergency care, Mr. Swaim was returned to be processed for release. He was again required to sign the same false statement before his property would be returned. Fearing further violence, he signed his name with a modification — writing "k. Erick" — in the hope that if he were killed, the discrepancy in the signature might be noticed.

55. Most of the photographs documenting Mr. Swaim's physical injuries were taken after this second assault by Tarrant County Jail officers.

55a. Tarrant County destroyed the video surveillance footage of the August 9, 2019 jail assault. When Plaintiff requested the footage through an open records request on October 29, 2019, Tarrant County Records Manager Jerry Rucker responded that "the video no longer exists" and that "the retention period is thirty (30) days." However, the incident was formally documented as a Code 6 Signal 5 (Officer/Inmate Fight) with a Use of Force Report (Service #2019-10877), an incident report by five officers, and photographs. Under the Texas Commission on Jail Standards (TCJS) rules and the Tarrant County Sheriff's own policies, video evidence associated with a documented use-of-force incident must be retained beyond the standard 30-day period. The destruction of this evidence — which would have shown whether the officers' accounts of the assault were truthful and whether RN Hill's attributed quote was accurate — constitutes spoliation of evidence and entitles Plaintiff to adverse inference instructions at trial. Plaintiff preserves the email correspondence with Jerry Rucker (dated October 29-30, 2019) as evidence of this destruction.

**H. Post-Release Events — Retaliation and Cover-Up**

56. Mr. Swaim was released at night with no means of contacting anyone. Fearing that the release was a pretext to harm him outside the jail, he swam across the Trinity River and walked along railroad tracks to avoid detection. He walked for over ten hours before he could borrow a phone to call for help.

57. After his release, Mr. Swaim sought the body camera footage through public records requests. The footage of Officer Balders was withheld on the grounds that her camera had malfunctioned. A portion of the Hurst Police footage was transmitted to the Texas Attorney General, who recommended denial of Plaintiff's open records request. The counter video from the City of Hurst, however, shows a clerk indicating she could not yet edit the footage — direct evidence that footage existed and was being actively managed.

58. All criminal charges arising from the August 7, 2019 incident were ultimately dismissed ("no-billed") by a grand jury. No charges related to the events at 971 W. Glade Road were pursued.

59. In October 2019 — more than three months after the events of July 1, 2019 — Bedford police issued a felony warrant for Plaintiff's arrest related to a medical emergency on that date. Plaintiff had never been contacted or notified in the intervening period. Despite documentation confirming he sought medical care that day, the Tarrant County District Attorney's office pursued these charges. The DA hired a private investigator to locate Jarod Gibson, apparently seeking information to use against Plaintiff. The charges were ultimately reduced to a misdemeanor, and Plaintiff completed probation. Plaintiff alleges the Bedford prosecution was initiated and pursued as part of a coordinated retaliatory effort to suppress his civil rights claims

against the City of Hurst and to damage his reputation in anticipation of this litigation. The pursuit of felony charges — later reduced only after Plaintiff's compliance — constitutes an additional act of retaliation under the First Amendment.

## V. CAUSES OF ACTION

### COUNT I — Excessive Force in Violation of the Fourth Amendment

### (Against Officer Dustin Smith, Individually — 42 U.S.C. § 1983)

60. Plaintiff incorporates by reference all preceding paragraphs.

61. Officer Smith used objectively unreasonable, excessive, and unconstitutional force against Mr. Swaim in violation of the Fourth Amendment to the United States Constitution.

62. At no point was Mr. Swaim engaged in criminal activity. The 911 caller had explicitly stated he did not want to press charges and only wanted a conversation facilitated. Most significantly, Officer Balders confirmed on camera — after speaking directly with Jarod — that Jarod stated Mr. Swaim had not hit him. There was no assault, no crime, and no probable cause. Mr. Swaim committed no offense and posed no threat. All charges arising from the August 7, 2019 incident were subsequently no-billed by a grand jury.

63. Officer Smith unlawfully entered Mr. Swaim's office building at 971 W. Glade Road, which he was using as his residence without a warrant, consent, or exigent circumstances, and then, without legal justification, initiated a physical assault. He struck Mr. Swaim with his fists, threw Mr. Swaim's phone to prevent him from calling for help, and then, after placing Mr. Swaim in handcuffs, deliberately deactivated his camera and subjected him to torture including slamming his head against the floor,

punching his testicles, and using his taser in "piledrive" mode on Mr. Swaim's genitals while a restrained, non-resisting arrestee.

64. This conduct constitutes excessive force in violation of the Fourth Amendment and was carried out knowingly, intentionally, and with malicious disregard for Mr. Swaim's constitutional rights, entitling Plaintiff to punitive damages.

**COUNT II — Unlawful Entry, False Arrest, and Unreasonable Search and Seizure**

**(Against Officers Smith, Balders, Arnold, and Jaynes — 42 U.S.C. § 1983)**

65. Plaintiff incorporates by reference all preceding paragraphs.

66. Officer Smith entered 971 W. Glade Road — Mr. Swaim's office building, which he was using as his primary residence since June 2019 — without a warrant, without consent, and without exigent circumstances. When Mr. Swaim answered the door, he explicitly told Officer Smith 'we're closed,' directly communicating that entry was not invited or permitted. Mr. Swaim then closed the door. Officer Smith used physical force to prevent the door from closing and pushed his way in. The warrantless forced entry into Plaintiff's office-residence violated the Fourth Amendment's prohibition on unreasonable searches and seizures. The constitutional protection against warrantless entry extends fully to a premises used as a residence, regardless of its commercial character. See Georgia v. Randolph, 547 U.S. 103 (2006); Payton v. New York, 445 U.S. 573 (1980).

67. There was no probable cause to arrest Mr. Swaim at any point. Before Officer Smith knocked on the door, Officer Balders had already spoken with Jarod Gibson — the 911 caller. On camera, Officer Balders reported Jarod's statement to Officer Arnold:

Jarod did not want to press charges, wanted only a conversation facilitated, and — critically — when asked directly whether Mr. Swaim had hit him, Jarod stated that Mr. Swaim had not hit him. Officer Smith never spoke with Officer Balders or Jarod before initiating contact with Mr. Swaim, and never learned what the 911 call was about. He proceeded entirely without knowledge of the complainant's statement and without any factual basis to believe a crime had occurred.

68. Mr. Swaim's subsequent arrest on multiple felony charges — without probable cause, following a warrantless forced entry, after the victim himself confirmed no assault occurred — constitutes false arrest in violation of the Fourth Amendment. The Hurst Police Department charged Mr. Swaim under Case No. 2019-003728 with Assault of a Peace Officer/Judge under Texas Penal Code § 22.01(B-2). Officer Smith — the man who committed the assault — is listed as both the investigating officer and the complainant. Officer Balders — who was not assaulted — is listed as the victim. The charge was cleared by arrest on December 10, 2019, and subsequently no-billed by a grand jury, confirming there was no lawful basis for the arrest.

69. Officer Balders' knowledge that Jarod had stated Mr. Swaim did not hit him — and her failure to communicate this to Officer Smith before he forced entry, and her failure to report it to other officers during and after the assault — renders her a participant in the unlawful arrest. Officers Arnold and Jaynes, who continued to detain and transport Mr. Swaim with knowledge of the circumstances, are similarly liable for the false arrest.

**COUNT III — Deliberate Indifference to Serious Medical Need**

**(Against Officers Smith, Arnold, and City of Hurst — 42 U.S.C. § 1983)**

68. Plaintiff incorporates by reference all preceding paragraphs.

69. Mr. Swaim sustained serious physical injuries as a result of the assault — including head lacerations, blunt force trauma to his genitals, taser injuries, dizziness, and neurological effects — all of which were known and visible to the responding officers.

70. Despite these obvious and serious medical needs, Officer Smith denied Mr. Swaim's repeated requests for an ambulance, stating "you're not going to the hospital." At the hospital, Officer Arnold denied Mr. Swaim water, obstructed medical personnel's efforts to properly position Mr. Swaim, and caused Plaintiff's discharge papers to be confiscated, depriving him of knowledge of his own medical condition.

71. Emergency medical personnel noted that taser use required cardiac monitoring, which was either not provided or not communicated to hospital staff. The treating physician left without reviewing the CAT scan results with Plaintiff. No MRI was performed despite Plaintiff's request.

72. This conduct constitutes deliberate indifference to serious medical needs in violation of the Due Process Clause of the Fourteenth Amendment.


**COUNT IV — Failure to Intervene**

**(Against Officers Balders, Arnold, and Jaynes — 42 U.S.C. § 1983)**

73. Plaintiff incorporates by reference all preceding paragraphs.

74. Officers Balders, Arnold, and Jaynes each had a constitutional duty to intervene to prevent the ongoing violation of Mr. Swaim's clearly established constitutional rights.

75. Officer Balders was present at the scene, was in the office during the initial assault, and was directly instructed by Officer Smith to leave so that he could administer "justice" on Plaintiff. Rather than refusing to comply and intervening to protect Mr. Swaim, she left the room.

76. Officer Arnold arrived while Mr. Swaim was screaming for help, observed blood on Mr. Swaim's head, heard Mr. Swaim report the assault, witnessed Officer Smith continuing to step on Mr. Swaim, and laughed. He failed to investigate or intervene. He expressed concern about the potential lawsuit, not about the victim.

77. Officer Jaynes was aware of the assault — evidenced by his on-camera statement that "somebody just got racked" — and took no action to intervene or report the misconduct.

**COUNT V — Suppression and Destruction of Evidence**

**(Against City of Hurst and Defendant Officers — 42 U.S.C. § 1983)**

78. Plaintiff incorporates by reference all preceding paragraphs.

79. Officer Smith deliberately deactivated his body-worn camera during the assault to prevent recording of his misconduct. Officer Balders' body camera footage — which she confirmed on camera was recording — was withheld and never produced, with the false explanation that it had malfunctioned. The initial audio from Officers Jaynes' and Arnold's body cameras was deleted before production. A portion of the footage was transmitted to the Texas Attorney General and withheld from Plaintiff.

80. This deliberate destruction and suppression of evidence constitutes obstruction of Plaintiff's constitutional right of access to courts, a violation of his due process rights,

and entitles Plaintiff to adverse inference instructions at trial. See Barnes v. McCormick, and related authority on destruction of evidence in § 1983 cases. See also the research paper located in Plaintiff's files: "Missing Police Body Camera Videos: Remedies, Evidentiary Fairness, and Automatic Sanctions."

## COUNT VI — Municipal Liability — Policy, Practice, and Failure to Train

## (Against City of Hurst — 42 U.S.C. § 1983)

81. Plaintiff incorporates by reference all preceding paragraphs.

82. The City of Hurst is liable under Monell v. Dep't of Social Services, 436 U.S. 658 (1978), because the constitutional violations suffered by Plaintiff resulted from official policies, customs, or practices of the City, and/or from the City's deliberate indifference to its officers' constitutional violations.

83. The City rehired Officer Disraeli Arnold despite having previously terminated him for threatening a minor and using anti-gay slurs — demonstrating deliberate indifference to the risk of constitutional violations by its officers and a policy of retaining officers with known histories of misconduct.

84. The President of the Hurst Police Officers Association and senior command officers reviewed the body camera footage of the assault while Plaintiff was still in jail and took no remedial action — demonstrating that the unlawful conduct was ratified at the supervisory and policy-making level. Supervisor P.K. Truly (Badge HU658) is listed as supervisor on Case No. 2019-003728, approving a report in which the assaulting officer listed himself as the investigator and listed a non-victim officer as the victim while omitting any reference to the assault on Mr. Swaim.

85. The City's policies and practices regarding body camera use, evidence preservation, and use of force were inadequate and caused the constitutional injuries suffered by Plaintiff.

## COUNT VII — Excessive Force by Tarrant County Jail Officers

## (Against Tarrant County and Sgt. Empkey, Officer Exter, Cpl. DeLaGarza, Cpl. Cortez, and Officer Vigil — 42 U.S.C. § 1983)

86. Plaintiff incorporates by reference all preceding paragraphs.

87. On August 9, 2019, while Plaintiff was fully restrained in handcuffs and leg shackles and posed no threat to anyone, five identified Tarrant County Jail officers — Sgt. M. Empkey, Officer M. Exter, Cpl. M. DeLaGarza, Cpl. J. Cortez, and Officer C. Vigil — attacked and beat him in retaliation for his refusal to sign a false statement certifying receipt of property he had not received.

88. This attack constituted excessive force in violation of the Fourteenth Amendment's prohibition on punishment of pretrial detainees. The conduct of the jail officers, and the apparent indifference of supervisory staff to this attack, reflects a policy or custom of the County of tolerating officer brutality.

89. Tarrant County is liable under Monell for the acts of its officers and for maintaining a custom and practice of tolerating the use of excessive force against detainees.

## COUNT VIII — Retaliation for Exercise of First Amendment Rights

## (Against All Defendants — 42 U.S.C. § 1983)

90. Plaintiff incorporates by reference all preceding paragraphs.

91. Throughout the events of August 7, 2019 and afterward, Mr. Swaim repeatedly stated he intended to report the officers' conduct, file a complaint, and pursue legal action. Officer Arnold directly acknowledged awareness of this, stating "Because you're going to sue us" when asked why he was focused on the ownership of the office. Officer Smith's statement implying Plaintiff might not survive to report him constituted an explicit threat to prevent Plaintiff from exercising his First Amendment rights.

92. The subsequent suppression of evidence, the initiation of the Bedford felony case, the DA's investigation through a private investigator, and the continuing prosecution of charges that were never leveled against Plaintiff constitute a pattern of retaliation for Plaintiff's expressed intent to exercise his constitutional right to seek redress.

## VI. DAMAGES

93. As a direct and proximate result of the acts and omissions of Defendants, Plaintiff Eric Swaim has suffered substantial and ongoing damages in the following categories:

### A. Physical Injuries

94. Plaintiff sustained documented physical injuries including: head lacerations requiring stitches; blunt force trauma to the genitals from both repeated punching and the application of a taser in 'piledrive' mode; dizziness and neurological effects consistent with repeated blows to the head; and additional bodily injuries sustained in the Tarrant County Jail assault. Emergency medical personnel at the scene noted that taser application required cardiac monitoring. Medical records from Kos/Danchak

Audiology & Hearing Aids (Dr. Wood, 101 W. Randol Mill Rd., Arlington TX) document that Plaintiff sustained a significant loss of hearing in his left ear following the incident, with an audiology appointment scheduled on December 10, 2019 to assess the hearing loss. Prior to the assault, Plaintiff had no such hearing loss.

95. Plaintiff was diagnosed with heart failure not long after the August 7, 2019 assault. Medical records from Precision Cardiac Vascular Care confirm that Plaintiff is under the active care of Dr. Viral Lathia and carries the following active diagnoses: Chronic systolic congestive heart failure (ICD-10 I50.22); Acute on chronic systolic congestive heart failure (ICD-10 I50.23); Atherosclerosis of native coronary artery without angina pectoris (ICD-10 I25.10); and Acute heart failure (ICD-10 I50.9). The earliest cardiac records on file begin in February 2020 — approximately six months after the August 7, 2019 assault. Plaintiff alleges that the physical trauma of the assault — including repeated blows to the head, taser shocks applied in 'piledrive' mode, the severe stress of the attack and subsequent incarceration, and the denial of prompt cardiac monitoring despite the EMT's specific on-scene recommendation — directly caused or substantially contributed to this diagnosis. Prior to the assault, Plaintiff had no history of heart failure. Plaintiff is prescribed Coreg, Lasix, Lisinopril, Potassium Chloride, and Crestor — a regimen consistent with chronic congestive heart failure management. This is a permanent, life-altering, and potentially fatal condition that continues to limit Plaintiff's ability to work and imposes ongoing medical costs.

**B. Psychological and Emotional Damages**

95.Plaintiff has suffered severe, ongoing, and documented psychological harm as a direct result of Defendants' conduct. He was assaulted while restrained, threatened with death, beaten a second time while in shackles, released at night with no means of communication, and forced to flee by swimming across the Trinity River and walking for over ten hours in fear of being killed. These events caused acute trauma and ongoing post-traumatic stress, anxiety, hypervigilance, and emotional suffering. The fear instilled by Officer Smith's implied death threat continued to affect Plaintiff's ability to function and to pursue legal remedies for years following the incident.

## C. Economic Damages — Lost Business Income and Real Estate Operations

96.Prior to the August 7, 2019 incident, Plaintiff was a licensed Texas real estate broker operating a successful real estate investment and property management business. The Swaim family's real estate holdings in Tarrant County alone are valued in excess of forty million dollars ($40,000,000). Mr. Swaim served as the primary broker and operational manager for this portfolio, performing acquisition, sales, leasing, and property management functions. His annual income from these activities was approximately two hundred thousand dollars ($200,000) per year, with additional business growth and appreciation beyond that figure.

97.As a direct and proximate result of the physical injuries, psychological trauma, ongoing criminal proceedings, and reputational harm caused by Defendants' conduct, Plaintiff has been unable to work since the date of the assault. He was forced to surrender his Texas real estate broker's license and substantially ceased active business operations.

His inability to work has continued without interruption from August 2019 through the present date — a period of over five years at the time of filing.

98. In addition to the loss of his income and professional license, Plaintiff was forced to sell multiple properties as a direct result of the financial consequences of Defendants' conduct, including:

(a) His office building at 971 W. Glade Road, Hurst, Texas — the property that also served as his residence at the time of the assault — which was sold under financial duress caused by Defendants' conduct;

(b) One or more residential rental properties that formed part of his real estate investment portfolio; and

(c) A home in which he was residing at the time of or following the assault.

Each of these forced sales constitutes a separate, concrete, and calculable economic loss, including loss of equity, lost future rental income, transaction costs, and the loss of appreciating assets in a rising real estate market. The total value of these forced property dispositions, including lost future appreciation and rental income, is to be established through expert testimony and appraisal evidence at trial and is expected to be substantial given the Swaim family portfolio's value in excess of forty million dollars.

99. Lost income damages are calculated as follows: at $200,000 per year for the period from August 2019 through the date of trial (estimated at approximately six years as of filing), past lost income alone exceeds one million two hundred thousand dollars ($1,200,000). Future lost income, accounting for Plaintiff's age, prior earning trajectory, and the growth rate of the underlying real estate business, will be determined by expert testimony and is expected to be substantial. Total economic

damages from lost income, past and future, are expected to exceed two million dollars ($2,000,000) and may be significantly higher.

100. In addition to lost operating income, Plaintiff suffered diminution in the value of business opportunities foregone during the period of incapacitation — including property acquisitions, development projects, and brokerage transactions that could not be pursued due to his inability to work. These consequential economic damages are to be determined at trial.

101. Plaintiff also suffered direct out-of-pocket losses including: emergency and hospital medical expenses from the night of the assault; ongoing medical costs associated with the heart failure diagnosis and treatment; costs associated with the criminal proceedings; the cost of obtaining records and evidence; housing costs incurred after the forced property sales; and expenses incurred in attempting to pursue legal remedies without counsel.

## D. Reputational Harm

101. Officer Arnold's repeated suggestion — made on camera and in the presence of others — that Plaintiff was under the influence of drugs, combined with the felony charges filed against Plaintiff arising from both the Hurst incident and the subsequent Bedford warrant, caused substantial reputational harm to Plaintiff in the community and in his professional capacity as a real estate broker. Plaintiff had no criminal history for drug-related offenses and tested negative for all illegal substances on multiple occasions. The false drug and mental impairment narrative was spread by officers without factual basis and in furtherance of the cover-up, and is directly contradicted

by: (a) Jarod Gibson's own statement to police that he had never seen Plaintiff use drugs; (b) multiple clean laboratory drug tests from 2018; and (c) written drug test results administered by Stephanie Vacanti LVN.

**E. Punitive Damages**

102. The conduct of the individual Defendants was willful, malicious, and carried out with callous disregard for Plaintiff's constitutional rights. Officer Smith deliberately deactivated his camera, dismissed a witness, and tortured a restrained man. He made implied death threats. He lied on camera about who opened the door. Multiple officers covered up these acts. Punitive damages are warranted against the individual Defendants in their individual capacities in amounts sufficient to punish this conduct and deter similar misconduct by law enforcement officers in the future.

**F. Summary of Damages Sought**

103. Plaintiff seeks the following categories of damages in amounts to be determined by the jury:

(a) Compensatory damages for physical pain and suffering, past and future;

(b) Compensatory damages for the heart failure diagnosis and its ongoing medical consequences, including treatment costs, reduced life expectancy, and physical limitations;

(c) Compensatory damages for hearing loss;

(d) Compensatory damages for psychological and emotional harm, past and future;

(e) Economic damages for lost business income from real estate operations, past and future;

(f) Economic damages for loss of professional license and business opportunity;

(g) Economic damages for the forced sales of the office building at 971 W. Glade Road, rental properties, and personal residence, including lost equity, lost future rental income, and lost appreciation;

(h) Consequential economic damages;

(i) Reputational damages;

(j) Punitive damages against individual Defendants;

(k) Attorneys' fees pursuant to 42 U.S.C. § 1988;

(l) Pre-judgment and post-judgment interest;

(m) Costs of court;

(n) All other relief to which Plaintiff is entitled.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Eric Swaim respectfully requests that this Court:

(1) Enter judgment in Plaintiff's favor on all counts;

(2) Award Plaintiff compensatory damages against all Defendants, jointly and severally, in an amount to be determined by the jury, including but not limited to damages for physical injury, psychological harm, lost business income, loss of professional license, and reputational harm;

(3) Award Plaintiff punitive damages against the individual Defendants in their individual capacities in an amount sufficient to punish the deliberate, malicious, and conscience-shocking nature of their conduct and to deter future misconduct;

(4) Issue a declaratory judgment that Defendants' actions violated Plaintiff's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution;

Swaim v. City of Hurst, et al. — Pro Se Complaint

(5) Award adverse inference instructions at trial, or other appropriate sanctions, based on Defendants' deliberate destruction and suppression of material evidence, including body camera footage;

(6) Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

(7) Award pre-judgment and post-judgment interest as permitted by law;

(8) Appoint counsel to represent Plaintiff pursuant to 28 U.S.C. § 1915(e)(1) given the complexity of this litigation and the exceptional circumstances presented;

(9) Grant such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to the Seventh Amendment to the United States Constitution and Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

John Eric Swaim, Pro Se

4101 West Green Oaks Blvd #305565

Arlington, TX 76016

682-888-8955

j.eric.swaim@gmail.com

Date: April 1, 2026

Swaim v. City of Hurst, et al. — Pro Se Complaint

## PLAINTIFF'S VERIFICATION

I, John Eric Swaim, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have

read the foregoing Complaint, and that the facts stated therein are true and correct to the best

of my knowledge, information, and belief.


John Eric Swaim

Executed on: 4/2/26